# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| **BRENDA DRIVER,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **CIVIL ACTION FILE NO.** |
| **v.** | : | **1:07-CV-3014-AJB** |
| | : | |
| **MICHAEL J. ASTRUE,** | : | |
| *Commissioner of Social* | : | |
| *Security Administration*, | : | |
| | : | |
| **Defendant.** | : | |

## O R D E R   A N D   O P I N I O N[1]

Plaintiff Brenda Driver ("Plaintiff") brought this action pursuant to

section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to obtain judicial review

of the final decision of the Commissioner of the Social Security Administration ("the

Commissioner") denying her application for Disability Insurance Benefits ("DIB")

under the Social Security Act ("the Act").[2]  For the reasons stated below, the decision

---

[1]     The parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73.  [*See* Dkt. Entry dated 1/7/2008].  Therefore, this Order constitutes a final Order of the Court.

[2]     Title II of the Social Security Act provides for federal disability insurance benefits.  42 U.S.C. § 401 *et seq*.

of the Commissioner is **REVERSED** and Plaintiff's case is **REMANDED** for further proceedings consistent with this Order and Opinion.

## I.  PROCEDURAL HISTORY

Plaintiff filed an application for DIB on May 1, 2003, alleging disability commencing on June 18, 2002.  [Record (hereinafter "R") R25-26].  Plaintiff's application was denied initially and on reconsideration.  [*See* R10, 16].  Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ").  [R20].  An evidentiary hearing was held on January 9, 2006.  [R492-522].  The ALJ issued his decision on June 6, 2006, denying Plaintiff's claims on the grounds that she retained the Residual Functional Capacity ("RFC") to perform sedentary work.  [R4N-4V].  Plaintiff sought review by the Appeals Council, and on July 13, 2007, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  [R4E, 4I, 4L].

Plaintiff then filed an action in this Court on November 9, 2007, seeking review of the Commissioner's decision.  *Brenda Driver v. Michael J. Astrue*, Civil Action File No. 1:07-cv-3014.  [Doc. 2].  The answer and transcript were filed on April 25 and April 28, 2008, respectively.  [Docs. 7-8].  The matter is now before the Court upon the

AO 72A
(Rev.8/8
2)

administrative record, the parties' pleadings and briefs, and oral argument, and is accordingly ripe for review pursuant to 42 U.S.C. § 405(g).

## II.    PLAINTIFF'S CONTENTIONS

As set forth in Plaintiff's brief, the issues to be decided are as follows:

1.    When new evidence is submitted to the Appeals Council ("AC"), the Court reviews the AC's decision not to vacate the ALJ's decision based on the new evidence, and evaluates the ALJ's decision based on the entire records, including evidence submitted to the AC.  When the evidence submitted to the AC, directly contradicts the findings of the ALJ, does the AC err by not vacating the ALJ's decision?

2.    When the treating physician opinions are not properly rejected, they are true as a matter of law.  The ALJ here relies on a non-examining consultant's opinion without citing any evidence contradicting the treating physician opinions, and falsely claiming lack of support.  Where the ALJ only gives invalid reasons for rejecting treating opinions, has he accepted them as true?

3.    Where a claimant offers credible testimony that requires a finding that she is disabled, the ALJ may not ignore the testimony.  The ALJ found Driver to be generally credible, and the Vocational Expert ("VE") testified that she cannot perform work.  Is the ALJ's failure to address this testimony reversible error?

4.    Where a claimant offers credible testimony that requires a finding she is disabled, the ALJ may not ignore the testimony.  The ALJ found Driver to be generally credible, and the VE testified that based on her testimony she cannot perform work.  Is the ALJ's failure to address this testimony reversible error?

3

[Doc. 12 at 1-2].

## III.   STATEMENT OF FACTS

### A.   *Factual Background*

Plaintiff was born on August 13, 1952, and was 53 years old at the time of the hearing.  [R26, 502].  She has a high school education, and her past relevant work was as a bookkeeper/accounts receivable manager.  [R502, 510-13].  Plaintiff alleges disability due to diabetes, congestive heart failure, arthritis, depression and obesity.  [R499-500, 505-07].

### B.   *Medical Records*

The medical evidence mainly is comprised of records from (1) Rockdale Hospital, [R77-81, 257-79]; (2) Fred Levin, M.D., [R82-105]; (3) the Emory Clinic, [R106-11, 374-81]; (4) Piedmont Hospital, [R112-52]; (5) Dinesh Chatoth, M.D., [R253]; (6) Peachtree Cardiovascular & Thoracic Surgeons, [R254-56]; (7) John Thomas, M.D., [R280-81]; (8) Conyers Family Practice (Jacek Lyszkowicz, M.D.), [R382-305]; (9) Enrique A. Flores, M.D., [R306-17]; (10) George Isshak, M.D., [R318-31]; (11) Donald E. Zavala, M.D., [R332-36]; (12) Internal Medicine Associates of Rockdale, P.C. (John M. Entrekin, M.D.), [R419-62]; (13) Diabetes & Endocrinology Associates, P.C. (David Jacobson, M.D.), [R348-

4

56, 382-406]; (14) Cardiac Disease Specialists, P.C. (Jack E. Dawson, Jr., M.D.), [R365-73]; and (15) Atlanta Nephrology Associates (Mazan Abdalla, M.D./Biren Joshi, M.D.), [R337-44, 463-76]. Additionally, with her brief in support of her appeal, [Doc. 12], Plaintiff submitted medicals records from Justin Huthwaite, a licensed psychologist, Anna-Marie Paulsen, M.D., and Dr. Dawson. [Docs. 13-2 to 13-4].

Review of these records discloses that Plaintiff was initially diagnosed with diabetes mellitus type I in 1967. [R406]. She was followed at Conyers Family Practice in April 2002 for diabetes, hypertension[3], cardiomegaly[4], an old myocardial infarction[5], obesity, and tendinitis of the right elbow. [R290-91]. During the approximate same time period, Dr. Isshak, a vascular surgeon, saw Plaintiff on complaints of bilateral leg pain on walking. [R329]. A March 14, 2002, segmental doppler pressure study

_____

[3]    Hypertension is abnormally high blood pressure. http://www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va=hypertension (last visited February 6, 2009).

[4]    Cardiomegaly is defined as the enlargement of the heart. http://www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va=cardiomegaly (last visited February 6, 2009).

[5]    A myocardial infarction is a heart attack. http://www2.merriam-webster.com/cgi-bin/mwmednlm (last visited February 6, 2009).

AO 72A
(Rev.8/8
2)

revealed open proximal arteries and distal arteriosclerosis[6] especially at the left infrapopliteal area signaling stenosis distally, "which is typical of diabetic patients." [*Id.*].

On May 24, 2002, Plaintiff was evaluated by Dr. Flores, a cardiologist, for an abnormal EKG due to Coronary Artery Disease ("CAD"). An abnormal perfusion study showed CAD, mixed territory of infarct[7] and ischemia.[8] [R315-16]. The impression included ischemic heart disease with moderate left ventricular systolic dysfunction. [R315]. It was recommended that Plaintiff undergo a cardiac catheterization. [*Id.*].

---

[6] Arteriosclerosis is a chronic disease characterized by abnormal thickening and hardening of the arterial walls with resulting loss of elasticity. http://www2.merriam-webster.com/cgi-bin/mwmednlm (last visited February 6, 2009).

[7] An infarct is an area of necrosis in a tissue or organ resulting from obstruction of the local circulation by a thrombus or embolus. http://www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va=infarct (last visited February 6, 2009).

[8] Ischemia is a deficient supply of blood to a body part (as the heart or brain) that is due to obstruction of the inflow of arterial blood (as by the narrowing of arteries by spasm or disease). http://www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va=ischemia (last visited February 6, 2009).

6

Plaintiff was admitted to Piedmont Hospital on June 18, 2002, for chest pain. [R112]. Her EKG was abnormal, showing left atrial enlargement and ST and T wave abnormality, suggesting inferolateral ischemia. [R231-32]. On June 21, 2002, Plaintiff underwent four vessel bypass surgery. [R118]. The diagnosis was chronic native coronary artery disease, and the findings were "[e]ndoscopic vein harvest right thigh. The LAD was calcified and diffusely diseased. Ejection fraction estimated at 45%." [*Id*.]. A follow-up EKG performed the next day showed right bundle branch block, possible inferior infarct, and T wave abnormality suggesting lateral ischemia. [R227]. Plaintiff reported feeling well following the surgery, and she was discharged on June 25, 2002. [R114, 120].

On July 9, 2002, Plaintiff saw Dr. Flores for a follow-up following her heart surgery. [R313-14]. She reported mild shortness of breath and chest discomfort. [*Id*.]. Physical examination was unremarkable. [*Id*.]. Dr. Flores held Plaintiff out of work until August 9, 2002, due to her congestive heart failure and severe ischemic heart diseases. [*Id*.]. At a follow-up appointment on August 9, 2002, Plaintiff complained of soreness, swelling in her legs and that she was not as far along in rehabilitation as she felt she should be. [R312]. Examination showed decreased breath sounds on the

7

left side. [*Id*.]. Plaintiff was noted to have symptoms of congestive heart failure and held out of work for an additional month. [*Id*.].

On July 15, 2002, Plaintiff was seen by Dr. Chatoth for treatment for microalbuminuria[9] and diabetes. [R253]. Dr. Chatoth noted that Plaintiff complained of gas and bloating since surgery, but she denied chest pain, shortness of breath, and urinary or bowel complaints. [*Id*.]. Dr. Chatoth observed that Plaintiff suffered from early diabetic nephropathy, but he also noted that her blood sugars were well-controlled and her microalbuminuria was controlled and stable. [*Id*.]. Plaintiff was advised to stop smoking. [*Id*.].

On August 18, 2002, Plaintiff was admitted to Rockdale Hospital for shortness of breath due to a large left-sided pleural effusion.[10] [R257]. Examination showed ischemic heart disease, congestive heart failure, chronic obstructive pulmonary disease,

---

[9] Microalbuminuria is albuminuria characterized by a relatively low rate of urinary excretion http://www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va=microalbuminuria (last visited February 9, 2009).

[10] Pleural effusion is as an abnormal accumulation of fluid in the pleural space. Excess fluid results from the disruption of the equilibrium that exists across pleural membranes. http://emedicine.medscape.com/article/807375-overview (last visited February 6, 2009).

8

anemia, diabetes, and hyperlipidemia.[11]  [R258].  The pleural space was drained and

Plaintiff was discharged on August 21, 2002.  [R257, 260].

Dr. Flores evaluated Significant Echo Measurements on August 26, 2002, and

found Plaintiff's left ventricle normal in size and low normal in function.  He noted that

the left ventricular ejection fraction systolic function was 45-50%, moderate apical

hypokinesis, and the septum was asynchronous.  He also noted as normal her right

ventricle, atria, other valves, aorta arch, pulmonary artery, and left atrial pressure.

He also found mild aortic valve sclerosis, trace TR,[12] no pericardial effusion and that

"the LV systolic function has improved significantly from 30% to low normal at the

present time" from her CABG surgery on June 21, 2002."  [R311].

On September 6, 2002, Dr. Flores noted Plaintiff had no complaints.  [R310].

Examination was normal and Plaintiff's echocardiogram showed improvement.  [*Id*.].

---

[11]     Hyperlipidemia is the presence of excess fat or lipids in the blood.
http://www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va=hyperli
pidemia (last visited February 6, 2009).

[12]     The Court assumes that "TR" stands for "tricuspid regurgitation."
Tricuspid regurgitation is a disorder in which the heart's tricuspid valve does not close
properly, causing blood to flow backward (leak) into the right upper heart chamber
(atrium) when the right lower heart chamber (ventricle) contracts.  Medline Plus
Medical Encyclopedia, http://www.nlm.nih.gov/medlineplus/ency/article/000169.htm
(last visited Mar. 4, 2009).

9

Plaintiff was advised to lose weight. [*Id*.]. On November 6, 2002, a cardiac rehabilitation progress report to Dr. Flores noted that Plaintiff's strength and endurance was improved, but she needed to concentrate on weight loss. [R309].

Dr. Isshak performed segmental doppler pressures[13] at rest and after exercise on December 20, 2002, due to Plaintiff's complaint of bilateral leg pain when walking. [R327]. The test showed a significant drop in pressure between the high thigh and above the knee, indicating bilateral superficial femoral occlusion and/or stenosis. After exercise, the ankle pressures dropped in a significant way especially at the right side. The arterial wave analysis and Pneumo waveforms were abnormal. Dr. Isshak's impression was bilateral femoral occlusions and/or severe stenosis. [*Id.*].

On January 15, 2003, Dr. Isshak ordered a Magnetic Resonance Angiogram ("MRA") of Plaintiff's exercise-induced claudication[14] of both legs. The conducting physician, Dr. Grossman, wrote that his impression was 60-70% short segment stenosis

---

[13]     Segmental doppler pressures measures arterial blood flow in the legs. *See* https://www.health.harvard.edu/fhg/diagnostics/arterial-blood-flow-studies-of-the-legs.shtml (last visited March 4, 2009).

[14]     Claudication is cramping pain and weakness in the legs and especially the calves on walking that disappears after rest and is usually associated with inadequate blood supply to the muscles. MedlinePlus Medical Dictionary, http://www.nlm.nih.gov/medlineplus/mplusdictionary.html, enter "claudication." (last visited February 27, 2009). The quoted definition relates to "intermittent claudication."

AO 72A
(Rev.8/8
2)

of the mid-right superficial artery, which may be amenable to angioplasty if the symptoms continued; mild diffuse atherosclerotic disease throughout the left proximal and mid-superficial femoral artery without significant occlusions or stenosis; mild infrapopliteal arterial disease bilaterally; moderate right mid-renal artery disease; patent (i.e., open) SMA[15] but abrupt cut off and possible occlusion of the distal celiac artery; and no significant inflow iliac arterial disease on either side. [R331].

Dr. Flores saw Plaintiff on February 25, 2003, for cramping in her legs on ambulation. [R308]. She was still in cardiac rehabilitation. [*Id*.]. A previous vascular study of the lower extremities by Dr. Isshak revealed minor peripheral vascular disease, so he recommended Plavix, but Plaintiff experienced no improvement. [*Id*.]. Plaintiff weighed 236 pounds, a gain of 34 pounds in five months, and was morbidly obese. [*Id*.]. She was noted to have severe diffuse coronary artery disease. [*Id*.]. Plaintiff was

---

[15] In the context of this report, "SMA" stands for either the "Small Mesenteric Artery" or the "Superior Mesenteric Artery." http://www.medilexicon.com/medicalabbreviations.php?keywords=SMA&search=abbreviation (last visited March 5, 2009). There are three mesenteric arteries, which supply the blood directly from the main artery of the heart to the large and small intestines. Medline Plus Medical Dictionary, http://www.nlm.nih.gov/medlineplus/ency/article/001156.htm (last visited March 5, 2009).

AO 72A
(Rev.8/8
2)

encouraged to lose weight, to follow-up with Dr. Isshak and see Dr. Flores in one year.  [*Id.*].

On March 21, 2003, Plaintiff was seen at Retina Specialists of Georgia for a hemorrhage in her left eye.  [R280-81].  Her vision was blurry and the impression was proliferative diabetic retinopathy ("PDR") OU, and vitreous hemorrhage ("VH") OS.  [*Id.*].

On June 23, 2003, Plaintiff was seen at Conyers Family Practice for foot and right knee pain radiating down her leg.  [R282].  Plaintiff also had pain in both arches when standing.  [*Id.*].  She weighed 234 pounds.  [*Id.*].  The assessment was acute lumbar pain and sciatica.  [*Id.*].  X-rays of Driver's lumbar spine revealed mild spurring at L4-5, spasm from T11 to L3, and facet arthritis from L4 to S1. [R293].  Physical therapy was recommended.  [R282].

On July 30, 2003, Dr. Flores completed a cardiac questionnaire regarding Plaintiff's heart condition.  [R306-07].  Dr. Flores advised that Plaintiff suffered from coronary artery disease, old myocardial infarction, hyperlipidemia, and carotid bruit.[16]  [R306].  Plaintiff also was noted to have increased fluid build up and shortness

---

[16]    A carotid bruit is an abnormal sound.  It is heard when using a stethoscope to listen to blood flow in the carotid artery.  A bruit indicates a f a t t y   b u i l d u p   ( a t h e r o s c l e r o s i s )   i n   t h e   a r t e r y.

AO 72A
(Rev.8/8
2)

of breath.  [*Id*.].  Dr. Flores advised that Plaintiff had symptoms daily, and mild physical activity such as walking exacerbated her condition.  [*Id*.].  Dr. Flores opined that Plaintiff should limit her activities to prevent symptoms and elevate her legs as needed.  [*Id*.].  He additionally noted that rest helps but did not relieve her symptoms.  [*Id*.].

On July 31, 2003, Plaintiff reported to Dr. Isshak that she had some decrease in her leg pain, but continued sharp pains when walking.  She claimed she could only walk "a little bit pas[t] mailbox & down road."  [R319].  She also reported intermittent numbness in her feet and toes.  [*Id*.].  The diagnoses remained infrapopliteal occlusion and diabetic neuropathy.  [R420].

On August 4, 2003, Plaintiff underwent cardiopulmonary diagnostics at CPX data by Dr. Zavala.  [R332-36].  She weighed 235 pounds and was noted to be 79 pounds overweight with a body mass index of 39.  [R332].  He noted that spirometry[17] and lung

—————————————

http://www.americanheart.org/presenter.jhtml?identifier=4480  (last  visited February 9, 2009).

[17]    Spirometry is a test where the patient breathes into a mouthpiece connected to an instrument called a spirometer which records the amount and rate of air breathed in and out over a period of time.  Medline Plus Medical Encyclopedia, http://www.nlm.nih.gov/medlineplus/ency/article/003853.htm (last visited March 3, 2009).

AO 72A
(Rev.8/8
2)

volumes revealed a mild restrictive defect, but the Maximum Voluntary Ventilation (MVV)[18] was within normal limits. The "significantly reduced" DLCO[19] was discounted because her oxygen saturation level was normal. [*Id.*]. During a submaximal exercise test,[20] the exercise was stopped due to inappropriate blood pressure change. [R333]. Dr. Zavala found Plaintiff to have moderate to severe functional impairment as to oxygen consumption (VO2/kg), and Plaintiff was noted to have a poor prognosis based on her METS (Metabolic Equivalents of [oxygen consumption])[21], a value which may have been underestimated because the test was

---

[18]     Maximum voluntary ventilation is the volume of air breathed when a person breathes as deeply and as quickly as possible for a given time (15 seconds). That result then usually is extrapolated to what could be breathed over one minute. S T E D M A N ' S   M E D I C A L   D I C T I O N A R Y , http://www.drugs.com/dict/maximum-voluntary-ventilation.html (last visited March 3, 2009).

[19]     DLCO stands for "diffusing capacity of the lung for carbon monoxide." Lung diffusion testing looks at how well gases are passing from the air sacs of the lungs into the blood, to determine whether the lung is sending enough oxygen into the blood. A . D . A . M .   M E D I C A L   E N C Y C L O P E D I A , http://www.nlm.nih.gov/medlineplus/ency/article/003854.htm  (last visited March 3, 2009).

[20]     Submaximal means the patient works below maximum effort. In submaximal tests, extrapolation is used to estimate maximum capacity.

[21]     Metabolic equivalent is the oxygen cost of energy expenditure measured at supine rest (1 MET = 3.5 mL $O_2$ per kg of body weight per minute); multiples of MET are used to estimate the oxygen cost of activity, 3–5 METs for light work; more

AO 72A
(Rev.8/8
2)

terminated early.  As to her cardiovascular functioning, Dr. Zavala found her heart rate normal at rest, her heart rate reserve high[22], her chronotropic index low, $O_2$ pulse above normal and her cardiac output-estimated low.  [*Id.*].  Dr. Zavala opined that "[t]his 50-yr-old woman is 100% disabled for the following reasons:  Obesity, diabetes (on an insulin pump), previous myocardial infarction, [left] ventricular dysfunction, and bypass surgery for severe coronary artery disease.  The prognosis is poor."  [R332].

An August 11, 2003, range of motion assessment concluded that Plaintiff could not reach overhead with her left hand and had a slightly reduced grip.  [R347].  The report found good dexterity with her fingers but "no long endurance [as to] overall movement of upper extremities and back."  [*Id.*].

On August 26, 2003, John Hassinger, M.D., a state agency medical consultant, reviewed Plaintiff's medical records[23] and concluded Plaintiff could perform a reduced

_____

than 9 METs for heavy work.  STEDMAN'S MEDICAL DICTIONARY, http://www.drugs.com/dict/metabolic-equivalent.html (last visited March 4, 2009).

[22]    Heart rate reserve (HRR) is a term used to describe the difference between a person's measured or predicted maximum heart rate and resting heart rate.  National Center for Biotechnology Information website, http://www.ncbi.nlm.nih.gov/pubmed/12471290 (last visited March 4, 2009).

[23]    Dr. Hassinger's handwritten notes reflect that he found the following medical records relevant for his analysis: (1) June 21, 2002, records concerning Plaintiff's CABG surgery; (2) Dr. Flores' August 26, 2002, echo study; (3) December

15

AO 72A
(Rev.8/8
2)

range of light work.  [R357-64].  He observed that Plaintiff had been diagnosed coronary artery disease, prior left anterior descending infarction, bilateral lower extremity claudication, diabetes, hypertension and obesity.  [R357].  His handwritten notes indicate that Plaintiff alleges disability due to diabetes, hypertension, heart condition, arthritis, constant swelling on legs, feet and hands, fatigue, and shortness of breath upon exertion.  [R358].  He indicated she had a long history of diabetes and hypertension.  He also noted that as of August 2002, she was found to have moderate hypokinesis, mild aortic valve sclerosis and that her right ventricle and atria were normal, trace TR, and no pericardial effusion.  He noted that her left ventricle function improved to low normal.  He also observed that the December 2002 segmented doppler pressures was significant for bilateral occlusions and/or severe stenosis.  He reported the results of Dr. Grossman's January 2003 MRA, and Dr. Flores' February 2003 note and July 2003 cardiac questionnaire.  Finally, he summarized the August 11, 2003, range of motion questionnaire.  [R359].

---

20, 2002, segmented doppler pressures; (4) January 5, 2003, magnetic resonance angioplasty; (5) Dr. Flores' notes dated February 25, 2003, [R308]; and the August 11, 2003, range of motion questionnaire, [R347].  [*See* R358-59].  There is no indication that he possessed or reviewed Dr. Zavala's August 2003 cardiovascular evaluation or any records after August 2003.

AO 72A
(Rev.8/8
2)

Dr. Hassinger concluded that Plaintiff could lift and carry twenty pounds occasionally and ten pounds frequently, stand and/or walk at least two hours in an eight hour workday, and sit for about six hours in an eight-hour workday. [R358]. He found that she could occasionally balance, stoop, kneel, crouch or crawl, but he also noted that Plaintiff could not climb ramps, stairs, ladders, scaffolds or ropes and should avoid extreme cold. [R359, 361]. He also found her report fully credible. [R362].

On December 30, 2003, Plaintiff reported to Dr. Isshak that her legs cramped, her feet were sore when she walked (especially her left foot) and that they felt numb. [R417]. On January 16, 2004, Dr. Isshak directed a non-invasive vascular examination of Plaintiff's lower extremity arteries. [R411]. Plaintiff was noted to have exercise pain, swelling, foot pain and cold feet bilaterally. [*Id.*]. Her ABI[24] was 0.81 on the right and 0.85 on the left, indicating mild peripheral vascular disease. [*Id.*]. On the same date, Dr. Isshak performed a segmental doppler pressures study due to Plaintiff's bilateral leg pain, diabetes, and hypertension. [R414]. The impression was

---

[24]     Peripheral vascular or arterial disease can be measured by measuring ankle systolic blood pressure, resulting in an ankle-brachial index (ABI), a ratio of ankle to arm systolic blood pressure. A low (< 0.90) ABI indicates peripheral vascular or arterial disease, which can be classified as mild (0.71 to 0.90), moderate (0.41 to 0.70), or severe (< 0.40). MERCK MANUALS ONLINE MEDICAL LIBRARY, http://www.merck.com/mmpe/sec07/ch080/ch080f.html (last visited March 5, 2009).

17

bilateral infrapopliteal arteriosclerosis due to diabetes. He noted a slight improvement in the indices since 2002. [*Id*.].

On May 13, 2004, Dr. Greenfield at Resurgens Orthopaedics saw Plaintiff for sharp pain across her lower back radiating into her right thigh. [R477-78].[25] Plaintiff was noted to suffer from arthritis, depression, hypertension, cardiovascular disease, diabetes, and kidney problems. [*Id*.]. Examination revealed that Plaintiff weighed 259 pounds. [*Id*.]. Her gait was slow, but normal. [*Id*.]. Plaintiff exhibited a painless range of motion, but had tenderness to palpation. [*Id*.]. X-rays revealed some decrease in disc height at L4-5 and L5-S1. [*Id*.]. The impression was lumbar disc disease with no evidence of radiculopathy. [*Id*.]. She was advised to lose weight. [*Id.*].

On July 23, 2004, Plaintiff was seen by Dr. Biren Joshi (of Dr. Abdalla's office) for a follow-up visit for her diabetes, morbid obesity, moderate renal insufficiency, and hypertension. [R475]. She voiced no new complaints. It was noted that she was being started on an insulin pump by Dr. Jacobson, and Dr. Joshi noted that her weight gain would continue to worsen with the insulin pump. Drs. Jacobson, Entrekin and Flores were copied on this report. [*Id.*].

_____

[25]     The identity of the referring physician was left blank. [*See* R477, 478].

18

AO 72A
(Rev.8/8
2)

On August 19, 2004, Plaintiff was examined at Atlanta Diabetes & Endocrinology Associates, P.C. (Dr. Jacobson). [R401].[26] She was noted to have erratic hypoglycemia. She stated she walked for 10 minutes three times per week. She was on an insulin pump. She weighed 258 pounds. [*Id.*]. She was advised to improve her meal plan compliance and walk one hour per day six days per week. [R402]

On October 8, 2004, Dr. Flores noted Plaintiff continued to gain weight and could not afford cardiac rehabilitation. [R407]. Plaintiff did not report any chest pain. [*Id.*]. Her weight was noted to be 260 pounds and she was advised to exercise and begin a vegetarian diet. [*Id.*].

The administrative record contains medical records from Internal Medical Associates of Rockdale, P.C. (Dr. John Entrekin) from October 2004 through November 2005, [R419-62], however, the record shows that Dr. Entrekin referred Plaintiff to other physicians as early as March 2, 2004. [*See* R427, 484 (mammography)].[27] On October 12, 2004, Dr. Entrekin noted Plaintiff to be obese,

---

[26] The record is somewhat unclear when Plaintiff began seeing Dr. Jacobson at Diabetes & Endocrinology Associates, P.C. The earliest medical note, a medications list, is dated May 20, 2004. [R405].

[27] Dr. Entrekin's records also contain medical reports from other doctors or laboratories. (*See* July 23, 2004, lab report [R476]; July 23, 2004, note from Dr. Joshi

AO 72A
(Rev.8/8
2)

weighing 264 pounds. [R460]. The diagnoses were obesity, elevated cholesterol, depression and diabetes. [*Id*.]. The possibility of a gastric bypass was discussed and Plaintiff advised that she would see if her insurance covered the procedure. [*Id*.]. Plaintiff's cholesterol was noted to be high on October 14, 2004, and Dr. Entrekin transmitted the results to Dr. Flores. [R459].

On November 18, 2004, Plaintiff was seen by Dr. Jacobson. She reported no incidents of hypoglycemia. She reported walking 30 minutes a day three times a week, and started Curves in September 2004, where she goes three times per week. Her weight was 265 pounds, up seven pounds. [R399].

On December 1, 2004, Dr. Entrekin's notes reflect Plaintiff's shortness of breath and tiredness. He prescribed a diuretic since she reported this happened once before when she had fluid build-up. On December 9, 2004, he reported nothing in the lab

_____

[R475]; August 12, 2004, lab report [R474]; December 30, 2004, colonoscopy report from Dr. Fred A. Levin, [R453]; January 27, 2005, lab report [R471-73]; January 25, 2005, note from Dr. Abdalla [R470]; April 27, 2005, lab report [R468-69]; April 26, 2005, note from Dr. Joshi [R432]; May 11, 2005, report from Dr. Dawson [R430]; May 26, 2005, lab report [R428]; August 13, 2005, note from Dr. Joshi, [R432]; August 25, 2005, lab report [R466]; September 8, 2005, note from Dr. Abdalla [R424]; September 13, 2005, lab report [R464-65]; and October 4, 2005, exam report from Dr. Dawson [R422-23]). Also, when Plaintiff saw Dr. Jacobson at Diabetes and Endocrinology Associates, P.C., on September 7, 2004, he noted that her primary physician was Dr. Entrekin, her cardiologist was Dr. Dawson, and Dr. Isshak was her vascular surgeon. [R406].

20

AO 72A
(Rev.8/8
2)

work explained the shortness of breath, so he recommended a chest x-ray. [R455]. He saw Plaintiff the next day, but there are no entries on the notes. [*Id.*].

On December 20, 2004, Dr. Entrekin saw Plaintiff on complaint of shortness of breath that had been occurring for 14 days, and worse in the last few days. Dr. Entrekin noted that there was no obvious cause for the acute worsening, and recommended lab work followed by a chest x-ray if not normal. [R454].

On January 5, Plaintiff saw a licensed dietitian at Dr. Jacobson's office. She reported that she was counting carbohydrates and going to Curves' nutrition class the next week. She was provided with tips on what to eat. [R398-99].

On January 26, 2005, Plaintiff was evaluated by Dr. Dawson of Cardiac Disease Specialists, P.C., on referral from Dr. Entrekin. [R438].[28] Dr. Dawson noted Plaintiff had a history of myocardial infarction with coronary artery bypass grafting. [*Id.*]. Following surgery, Plaintiff had significant dyspnea[29] and pleural effusions which were

_____

[28]     The first page of Dr. Dawson's assessment, (incidentally, located in Dr. Entrekin's records), states that the evaluation occurred on January 26, 2004. [R438]. However, a review of the remainder of the assessment for that date indicates the 2004 date is merely a typographical error and the evaluation actually occurred on January 26, 2005.

[29]     Dyspnea is difficult or labored respiration. http://www2.merriam-webster.com/cgi-bin/mwmednlm (last visited February 9, 2009).

AO 72A
(Rev.8/8
2)

drained.  [*Id*.].  Plaintiff reported to Dr. Dawson that she never really recovered her energy following her surgery.  [*Id*.].  Dr. Dawson also noted that Plaintiff gained 60 pounds during the same time period.  [*Id*.].  Plaintiff was noted to have a history of diabetes, swelling, diminished vision, leg cramps, and depression, among other things.  [*Id*.].  Plaintiff's chief complaint was shortness of breath, primarily with exertion.  [R439].  The impression was coronary artery disease, insulin dependent diabetes with retinopathy and nephropathy, hypercholesterolemia, hyperlipidemia, obesity, hypertension, renal insufficiency, and peripheral vascular disease.  [*Id*.].  She was advised to continue with her same course of treatment.  [*Id*.].

On February 9, 2005, Dr. Entrekin noted that Plaintiff's diabetes was poorly controlled.  [R437].

Plaintiff reported to Dr. Jacobson on February 17, 2005, that she experienced hypoglycemia once a week, that she had increased retinopathy with a hemorrhage in November 2004, numbness in her feet and hands, and shortness of breath upon exertion.  She was doing aerobic exercise at Curves for 30 minutes 3 times a week, and she claimed depression.  She did not like "carb counting" as it increased her blood sugars.  She weighed 255 pounds.  [R391].  Dr. Jacobson assessed Plaintiff with fair

AO 72A
(Rev.8/8
2)

glycemic control, peripheral polyneuropathy, and proteinuria.[30]  He advised her to

continue with improving meal compliance and Curves.  [R392].  The lab results were

transmitted to Dr. Dawson.  [R394].

On March 22, 2005, Plaintiff was found to have a low normal potassium level

and stable kidney function.  The results were transmitted to Dr. Dawson.  [R434, 435-

36].

On April 19, 2005, Plaintiff was seen by Dr. Entrekin.  She reported that she was

frustrated by her energy level, "but still OK [with] Effexor."[31]  [R433].  The notes

reflected no dyspnea.  [R433].

_____

[30]     Proteinuria is the presence of excess protein in the
u r i n e .      M e d l i n e     P l u s     M e d i c a l     D i c t i o n a r y ,
http://www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va=proteinuria
(last visited March 5, 2009).

[31]     Effexor is a brand name for Venlafaxine.  Venlafaxine is used to treat
depression. Venlafaxine extended-release (long-acting) capsules are also used to treat
generalized anxiety disorder (excessive worrying that is difficult to control), social
anxiety disorder (extreme fear of interacting with others or performing in front of others
that interferes with normal life), and panic disorder (sudden, unexpected attacks of
extreme fear and worry about these attacks). Venlafaxine is in a class of medications
called selective serotonin and norepinephrine reuptake inhibitors (SNRIs). It works by
increasing the amounts of serotonin and norepinephrine, natural substances in the brain
that help maintain mental balance.  MedlinePlus Drug Information
(http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694020.html) (last visited
February 25, 2009).

AO 72A
(Rev.8/8
2)

Plaintiff saw Dr. Dawson on May 11, 2005, and was noted to weigh 264 pounds. [R363-71, 430-32]. She had no complaints of shortness of breath, fatigue, palpitations, or chest pain. [*Id*.]. Dr. Dawson noted that Plaintiff's symptoms had remained stable since her last appointment. [*Id*.].

When Plaintiff saw Dr. Jacobson on June 2, 2005, she weighed 259 pounds, up four pounds since the last visit. She reported erratic hypoglycemia of 1 to 2 times per week, shortness of breath on exertion, but that she was doing Curves for 30 minutes 3 times a week and yard work. He noted that she saw Dr. Joshi for increased swelling and he put her on Lasix. [R388]. Dr. Jacobson recommended that she continue Curves and improve meal plan compliance. [R389].

Dr. Entrekin reported that on June 7, 2005, Plaintiff's lab work was okay, in that her cholesterol was good and her kidney function was a "little better." [R434].

Plaintiff reported continued shortness of breath when seen at Atlanta Nephrology Associates on September 8, 2005. [R463]. Plaintiff was noted to have gained 60 pounds over 2 ½ years. [*Id*.]. In this assessment, Dr. Abdalla noted moderate renal insufficiency, stage III kidney disease, systemic arterial hypertension, morbid obesity with a body mass index was 45, history of coronary artery disease, and hyperlipidemia. [*Id*.]. Plaintiff was advised to consult another physician about ways

24

to decrease her calories and lose some weight. [*Id.*]. Drs. Entrekin and Jacobson were copied on this report. A few days later,[32] Plaintiff saw Dr. Abdalla, and his notes reflect no shortness of breath reported. [R424].

Dr. Jacobson noted on September 15, 2005, that Plaintiff weighed 268 pounds, an increase of nine pounds since the last visit. [R385]. She reported fatigue, lethargy and malaise, and shortness of breath upon exertion. She reported aerobic exercises for 30 minutes 3 times a week. She also told Dr. Jacobson she experienced a left eye hemorrhage. She was "frustrated" with her diabetes, but Dr. Jacobson noted no psychosocial issues, such as depression. [*Id.*]. His assessment was that her glycemic control was poor, she had poor compliance with her diet and an erratic activity pattern, and she had the associated disorders of height cholesterol and coronary artery disease. He recommended improved meal compliance and calorie counting, and to try walking 1 hour a day 5 days a week. [R386].

Plaintiff returned to Dr. Dawson on October 4, 2005, complaining of some shortness of breath, tightness in her chest, and awareness of increased symptoms in crowds. [R365-68, 422-23]. He noted her medications as Metolazone (a diuretic), Klor-Con (potassium), Cardizem XT (to control high blood pressure and angina),

_____

[32]    The date is obscured by the Bates page number.

AO 72A
(Rev.8/8
2)

Furosemide (a diuretic), Plavix (an anti-coagulant), Aspirin, Effexor, Lipitor (cholesterol reducer), Tricor (cholesterol reducer), Tylenol and Humalog insulin.[33] Her echocardiogram showed improvement in left ventricular chamber size, persistent left ventricular hypertrophy[34] and left atrial enlargement. [*Id*.]. He diagnosed her with hypertension, insulin-dependent diabetes, overweight and hypercholesterolemia. He increased her Cardizem XT from 120 mg. to 180 mg., instructed her to keep a blood pressure and pulse diary at home and follow-up in his office in 3 weeks. He noted that if her heart rate did not improve and her blood pressure was not controlled, the Cardizem XT would be reduced to 120 mg., and he would add a beta blocker. [R365-66]. He sent this evaluation to Dr. Entrekin.

On October 24, 2005, Dr. Entrekin saw Plaintiff for a six-month follow-up. He wondered whether her thyroid was "our of whack." [R419]. Plaintiff reported that she was doing exercise three times a week at Curves, but that her insulin was increased

---

[33]      The descriptions of these medicines are found at MedlinePlus, Drugs & Supplements, http://www.nlm.nih.gov/medlineplus/druginfo (last visited February 26, 2009).

[34]      Hypertrophy is excessive development of an organ or part. Specifically increase in bulk (as by thickening of muscle fibers) without multiplication of parts. http://www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va=hypertrophy (last visited February 9, 2009).

AO 72A
(Rev.8/8
2)

and that she still was trying to lose weight. She weighed 267.4 pounds, up 15 pounds since her last visit. Her "heart [was] doing well on recent ECHO," and her mood was better. Dr. Entrekin's diagnosis and treatment consisted of checking on her increased cholesterol, checking her renal tubular cells due to her borderline hypertension and due to her obesity and diabetes, and strongly encouraging weight loss. [*Id.*]. A November 1, 2005, note provided that her cholesterol was "adequate," that her triglycerides were mildly elevated and that the results would be shared with Dr. Dawson. [R426].

Dr. Jacobson noted on November 17, 2005, that Plaintiff's glycemic control was poor, and he recommended improved compliance with a meal plan and walking once a day, 6 days a week. He wanted a follow-up visit in one month. [R382].

Dr. Entrekin prepared a Functional Capacity Evaluation on November 30, 2005. [R485-91]. He noted that he was her primary care physician and that he saw her every three months for 18 months. He diagnosed her with diabetes, congestive heart failure, diabetic retinopathy, arthritis in lower spine, renal insufficiency, hypertension, coronary artery disease following coronary artery bypass graft and depression. He noted that she lacked energy and breath with minimal exertion and had back pain which kept her from being able to sit or stand in one position for very long. [R485].

27

He described her back pain as radiating down her right leg, and that it was constant, made worse by lifting or holding one position. He further stated that her pain was 7/10 at baseline and 9-10/10 when flared. Her range of motion was significantly reduced, and she had tenderness and muscle weakness. She also suffered from depression. [R486].

In addition, Dr. Entrekin wrote that Plaintiff's pain was severe and would preclude the activity precipitating pain, and that her pain frequently interferes with her attention and concentration. He concluded that Plaintiff's obesity, degenerative disc disease and depression reasonably would be expected to produce the symptoms (including pain) and the functional limitations. Her insulin intake required frequent monitoring and regular meals. Her back pain, congestive heat failure, coronary artery disease and diabetic retinopathy were expected to last more than 12 months and were unlikely to improve. [R487].

Dr. Entrekin posited that Plaintiff could sit for 20 minutes, stand for 10 minutes and walk for 5 minutes. She needed to walk 3 times an hour for 5 minutes during an 8-hour work day, and needed a job which permitted shifting positions as will from sitting, standing or walking. He opined that she could sit, stand and walk less than 2 hours in an 8-hour work day with normal breaks, [R488], she needed to lay down

28

during work, her legs should be elevated while sitting, and she could not lift or carry 10 pounds in a competitive work situation. He also noted that she had significant limitations in both hands as to grasping, turning, twisting and twisting objects, fine manipulations and pushing and pulling, but no limitations in reaching up or down. He found no limitations in the use of her feet or toes for repetitive movements. [R489]. Dr. Entrekin also stated that she could occasionally bend, frequently reach, but never squat, crawl, climb, stoop, crouch or kneel. [R490]. He wrote that she would be absent three or more days a month due to her impairments and treatment. He concluded that since August 2002,

> Pt. suffers from multiple medical problems requiring multiple prescription medicines. The combination of all this leads to a much reduced energy level which affects her ability to work at a regular job.

[R491].

In addition to her brief in support of this appeal, Plaintiff submitted a consultative psychological evaluation performed on October 5, 2007, by Justin Huthwaite, a licensed psychologist. [Doc. 13-2]. In conducting his evaluation, he met with Plaintiff, conducted a Mental Status Examination, and reviewed records from

29

Dr. Entrekin dated April 24, 2007.[35]  [*Id.* at 1, 2, 4].  Huthwaite's diagnostic impression was moderate, recurrent major depression and breathing-related sleep disorder.  [*Id.* at 5].

On March 14, 2008, Anne-Marie Paulsen, M.D., completed a Medical Assessment of Ability to do Work Related Activities (Mental), in which she opined that Plaintiff suffers from severe chronic major depression and severe neuropathic pain.  [Doc. 13-3 at 1].  Dr. Paulsen indicated that Plaintiff had seriously limited or no useful ability to function in areas of making occupational, performance and personal-social adjustments.  [*Id.* at 1-2].  In response to the question "[h]ow long have the limitations described above existed at this level?", Dr. Paulsen wrote "– ~."  [*Id.* at 2].  She further opined that Plaintiff had marked limitations in all areas of work-related functioning.  [*Id.* at 3-4].

On March 19, 2008, Dr. Dawson stated that Plaintiff is Class III under the New York Heart Association Functional Classification, which indicates she is comfortable at rest but has symptoms with less than ordinary effort.  [Doc. 13-4 at 1].  Additionally, Dr. Dawson opined that Plaintiff's therapeutic classification is Class D,

---

[35]  The administrative record does not contain any records from Dr. Entrekin dated April 24, 2007.

AO 72A
(Rev.8/8
2)

indicating her ordinary physical activity should be markedly restricted. [*Id*.]. He further opined that Plaintiff could lift 10-15 pounds at one time maximum and 5-10 pounds frequently, that she could stand/walk for 10 minutes and sit for 1 to 2 hours during the day, that she could remain at a job for 1 hour before having to lie down, that she could not push and pull arm or leg controls, that her mobility and dexterity was significantly diminished due to heart disease and diabetes, that she could never squat, crawl, or climb, and could occasionally bend, that she should not be exposed to unprotected heights, moving machinery, marked changes in temperature and humidity, or driving automotive equipment and that she had a moderate restriction to exposure to dust and fumes. [*Id*. at 2]. He also wrote that he believed her pain complaints, that there is objective evidence of a condition that support these complaints, and that pain would occur even if the exertional limitations were followed. [*Id.* at 3]. He also concluded that the pain would significantly reduce concentration and attention and that the pain would produce stress or the ability to cope with stress. He stated that during a typical work week her degree of moderate pain would be 60% of the time. [*Id.*].

   C.   *Evidentiary Hearing Before the ALJ*

   Plaintiff was 53 years old at the time of the hearing. [R502]. She is a high school graduate. [*Id*.]. Plaintiff testified that she last worked in January 2003. Due to

AO 72A
(Rev.8/8
2)

her open heart surgery, she gets tired really easily, has no energy and cannot concentrate. [R497-98]. Plaintiff explained that she could not work because "I can't hold up on a day to day basis with a job." [R499].

She further testified that she "gets out of breath quickly with any kind of exertion. With walking I walk about five minutes and have to stop and rest and get my breath," [R499]; and "I have no energy, I mean, I can't do things that I used to could do because I get tired very easily and just exhausted. I get out of breath with any little thing I try to do. I get depressed about it." [R507].

The Vocational Expert ("VE") testified that Plaintiff's past relevant work was as a bookkeeper and accounts receivable and accounts payable clerk. [R510]. The VE also testified that all of Plaintiff's past relevant work was performed at a sedentary level, [R511]; and that Plaintiff would have transferable skills to other sedentary office positions such as accounting clerk and telephone receptionist. [*Id.*].

The ALJ posed one hypothetical question to the VE. In response to the ALJ's question whether a person with the RFC to occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk for at least 2 hours and sit for 6 hours in an 8-hour work day, and must avoid climbing ramps, stairs, ladders, ropes, and scaffolds as well as extreme cold, [R515-16], the VE responded that such a person "could perform most of the so

AO 72A
(Rev.8/8
2)

called office manager positions which the DOT described as light, some of the filing and that sort of thing involved." [R517]. However, the VE also testified that if a person could perform Plaintiff's past work or any other work and had (1) severe headaches twice a week causing interference with her ability to concentrate for four to six hours, (2) crying spells for up to an hour a day, and (3) to urinate twice an hour, [R520], the severe headaches would preclude Plaintiff's past relevant work and any other work. [*Id.*]. The VE explained that frequent urination would not pose an employment problem, however, the crying spells would be disruptive to an employer and "they would probably let her go after a short time." [R521].

Following a discussion with Plaintiff's counsel regarding Plaintiff's RFC limitations, the ALJ acknowledged that if Plaintiff only could perform some sedentary functions, but not for a duration of time, then the ALJ would find her disabled. [R519].

## IV. ALJ'S FINDINGS OF FACT

In his June 6, 2006, decision, the ALJ made the following findings of fact:

1.   The claimant met the insured status requirements of the Social Security Act through December 31, 2007.

2.   The claimant has not engaged in substantial gainful activity at any time relevant to this decision (20 C.F.R. §§ 404.1520(b) and 404.1571, *et seq.*).

AO 72A (Rev.8/82)

3.  The claimant has the following severe impairments: insulin dependent diabetes mellitus with neuropathy; coronary artery disease, status post bypass surgery; and obesity (20 C.F.R. § 404.1520(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work with no climbing of ladders, ropes, or scaffolds and only occasional balancing, stooping, kneeling, crouching, or crawling. The claimant must avoid concentrated exposure to extreme cold.

6.  The claimant is able to perform past relevant work as a bookkeeper (20 C.F.R. § 404.1565).

7.  The claimant was born August 13, 1952 and was 50 years old on the alleged disability onset date, which is defined as closely approaching advanced age (20 C.F.R. § 404.1563).

8.  The claimant has at least a high school education and is able to communicate in English (20 C.F.R. § 404.1564).

9.  The claimant has acquired work skills from past relevant work (20 C.F.R. § 404.1568).

10. Considering the claimant's age, education, work experience, and residual functional capacity, the claimant has acquired work skills from past relevant work which are transferable to other occupations with jobs existing in significant numbers

AO 72A
(Rev.8/8
2)

in the national economy (20 C.F.R. §§ 404.1560(c), 404.1566 and 404.1568(d)).

11. The claimant has not been under a "disability" as defined in the Social Security Act, from June 18, 2002 through the date of the decision (20 C.F.R. § 404.1520(g)).

[R4R-4V].

In making this determination, the ALJ summarized Plaintiff's medical records, as follows. He noted her treatment by Dr. Flores, [R4R-4S], but found that his July 30, 2003, assessment that she must elevate her legs "'as needed'" was based upon his examination of Plaintiff on February 25, 2003. [R4S]. The ALJ recognized that Dr. Zavala on August 4, 2003, found her disabled due to her obesity, diabetes, previous myocardial infarction, left ventricular dysfunction and bypass surgery. He also noted that January 2004 doppler imaging showed improvement in her lower extremities. [*Id.*]. The ALJ also discussed that Plaintiff was advised to lose weight to alleviate back pain. [*Id.*]. He reported that in July 2004 Plaintiff was diagnosed with mild renal insufficiency and slowly worsening weight gain. He indicated that Plaintiff had no ongoing chest pain according to Dr. Flores in October 2004, and was unable to afford cardiac rehabilitation. However, the ALJ noted that on October 12, 2004,

AO 72A
(Rev.8/8
2)

Plaintiff reported going to Curves three times per week and asked about a reduced calorie diet. [*Id.*].

The ALJ discussed Plaintiff's shortness of breath as reported by Dr. Dawson in January 2005 and Dr. Joshi in April 2005. He also noted that Dr. Dawson found no shortness of breath, fatigue, palpitations or chest pain in May 2005. The ALJ further noted that the nephrologist had recommended a change in her diuretic and Dr. Dawson interpreted an echocardiogram as suggesting dilated cardiomyopathy secondary to hypertension. The ALJ stated that Plaintiff's ejection fraction was normal. He noted that during a follow-up appointment in October 2005, Plaintiff had gained one pound but complained of occasional arthralgias and chest tightness in crowds. [*Id.*].

The ALJ also stated that although Plaintiff had been treated for depression with medication, she had not complained of any adverse side effects from the medications, nor claimed that the depression was resistant to treatment, nor sought counseling or other therapeutic measures. As a result, the ALJ concluded that depression was not a severe impairment because it was adequately addressed by medicine and she had no limitations from her depression that caused even a minimal degree of performing work-related activities. [R4S-4T].

AO 72A
(Rev.8/8
2)

The ALJ also stated that Plaintiff's medically determinable impairments could be expected to produce the alleged symptoms and that her statements concerning the intensity, duration, and limiting effects were generally credible. [R4T]. That is, Plaintiff complained of dyspnea, easy fatigability, and back, leg and foot pain. The dyspnea and fatigability were credible and consistent with her cardiac impairment, and her musculoskeletal complaints were consistent with her physical problems and her obesity. [R4T].

The ALJ observed that disability determination services had evaluated Plaintiff's RFC and determined that she was capable of sedentary work with postural restrictions. [*Id.*]. The ALJ noted that the disability determination services evaluation "contains a thorough review of the medical records and appears to be the best estimate of the claimant's residual functional capacity," and as a result, was given significant weight. [*Id.*].

At the same time, the ALJ discounted Dr. Entrekin's November 30, 2005, RFC evaluation because his characterization of Plaintiff's depression was inconsistent with his own treatment notes and "lack of further treatment other than medications." [*Id.*]. The ALJ also discounted Dr. Entrekin's opinion that Plaintiff had low energy, could not sit or stand for long periods, had numerous manipulative limitations and must elevate

37

her legs, concluding that he was not a specialist, and Plaintiff saw specialists for her diabetes, renal failure and heart disease. [R4T]. The ALJ also rejected Dr. Entrekin's opinions that Plaintiff suffered from severe depression, disabling back pain and manipulative restrictions as contrary to his treatment notes and the record as a whole. [R4T-4U]. Therefore, the ALJ gave Dr. Entrekin's opinion little weight. [R4U].

Noting Plaintiff's back and leg pain with claudication, which could be exacerbated by cold, and her obesity which worsened her musculoskeletal complaints, the ALJ found that Plaintiff needed to avoid cold, climbing and only occasionally balance, stoop, kneel, crouch, or crawl. However, he concluded that these restrictions did not erode the occupational base of sedentary work. [R4U]. The ALJ further noted that the VE found that an individual with the Plaintiff's age, education, past relevant work experience, and RFC could perform Plaintiff's past relevant work as a bookkeeper, which was sedentary work, or an accounts receivable clerk. [R4V]. The ALJ also determined that, based on the testimony of the VE, the Plaintiff had acquired work skills from her past relevant work that were transferable to other jobs existing in significant numbers in the national economy. [*Id*.]. As a result, the ALJ found that Plaintiff was not disabled or entitled to Social Security benefits. [*Id*.].

AO 72A
(Rev.8/8
2)

## V.  STANDARD FOR DETERMINING DISABILITY

An individual is considered disabled for purposes of disability benefits if she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically accepted clinical or laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3).

The burden of proof in a Social Security disability case is divided between the claimant and the Commissioner.  The claimant bears the primary burden of establishing the existence of a "disability" and therefore entitlement to disability benefits. *See* 20 C.F.R. § 404.1512(a).  The Commissioner uses a five-step sequential process to determine whether the claimant has met the burden of proving disability. *See* 20 C.F.R. § 404.1520(a); *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001);

*Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). The claimant must prove at step one that she is not undertaking substantial gainful activity. *See* 20 C.F.R. § 404.1520(b). At step two, the claimant must prove that she is suffering from a severe impairment or combination of impairments which significantly limits her ability to perform basic work-related activities. *See* 20 C.F.R. § 404.1520(c). At step three, if the impairment meets one of the listed impairments in Appendix 1 to Subpart P of Part 404 (Listing of Impairments), the claimant will be considered disabled without consideration of age, education and work experience. *See* 20 C.F.R. § 404.1520(d). At step four, if the claimant is unable to prove the existence of a listed impairment, she must prove that the impairment prevents performance of past relevant work. *See* 20 C.F.R. § 404.1520(e). At step five, the regulations direct the Commissioner to consider the claimant's residual functional capacity, age, education and past work experience to determine whether the claimant can perform other work besides past relevant work. *See* 20 C.F.R. § 404.1520(f). The Commissioner must produce evidence that there is other work available in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must prove an inability to perform the jobs that the Commissioner lists. *Doughty*, 245 F.3d at 1278 n.2.

AO 72A
(Rev.8/8
2)

If at any step in the sequence a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends. *See* 20 C.F.R. § 404.1520(a). Despite the shifting of burdens at step five, the overall burden rests upon the claimant to prove that she is unable to engage in any substantial gainful activity that exists in the national economy. *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983).

## VI. SCOPE OF JUDICIAL REVIEW

The scope of judicial review of a denial of Social Security benefits by the Commissioner is limited. Judicial review of the administrative decision addresses three questions: (1) whether the proper legal standards were applied; (2) whether there was substantial evidence to support the findings of fact; and (3) whether the findings of fact resolved the crucial issues. *Fields v. Harris*, 498 F. Supp. 478, 488 (N.D. Ga. 1980). This Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. If supported by substantial evidence and proper legal standards were applied, the findings of the Commissioner are conclusive. *Lewis v. Callahan*, 125 F.3d 1436, 1439-40 (11th Cir. 1997); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987); *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239

41

(11th Cir. 1983).  Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence.  *Sewell v. Bowen*, 792 F.2d 1065, 1067 (11th Cir. 1986).  "Substantial evidence" means more than a scintilla, but less than a preponderance.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and it must be enough to justify a refusal to direct a verdict were the case before a jury.  *Richardson v. Perales*, 402 U.S. 389 (1971); *Hillsman*, 804 F.2d at 1180; *Bloodsworth*, 703 F.2d at 1239.  "In determining whether substantial evidence exists, [the Court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision."  *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  In contrast, review of the ALJ's application of legal principles is plenary.  *Foote v. Chater*, 67 F.3d 1553, 1558 (11th Cir. 1995); *Walker*, 826 F.2d at 999.

## VII.   ANALYSIS OF CLAIMS OF ERROR

### A.     *New Evidence*

Plaintiff argues that the new evidence submitted to the Appeals Council shows that the ALJ erred in concluding that Plaintiff's mental impairment is not severe and that the ALJ was wrong to reject the opinion of Dr. Entrekin regarding Plaintiff's heart condition. [Doc. 12 at 17].  Plaintiff also argues that the post-hearing evidence of

42

marked mental limitations directly contradicts the ALJ's conclusion that Plaintiff had no significant mental impairments and Plaintiff's treating cardiologist's opinion that she needed bed rest during the day. [*Id*. at 18].

Defendant responds that Plaintiff did not submit the new evidence to the Appeals Council, and therefore, the new evidence may only be considered to determine if a remand is warranted under sentence six of 42 U.S.C. § 405(g). Defendant contends that Plaintiff has not shown that the evidence is new and material. [Doc. 15 at 10-11]. Specifically, Defendant argues that Dr. Huthwaite's report provides no insight into Plaintiff's mental condition during the relevant period and Plaintiff has failed to show how Dr. Huthwaite's report could have changed the ALJ's decision. [*Id*. at 11-12]. Defendant also argues that Dr. Paulsen's opinion is not material because her opinion does not indicate that it represented Plaintiff's condition before June 6, 2006, is not supported by medical findings and is inconsistent with the record as a whole. [*Id*. at 12]. Finally, the Commissioner argues that Dr. Dawson's opinion also is not material because he did not indicate that his opinion applied to Plaintiff's condition on or before June 6, 2006, and his opinion is inconsistent with the record as a whole and not supported by medical findings. [*Id*.].

AO 72A
(Rev.8/8
2)

Plaintiff replies that the new evidence is material and consistent with the evidence in the record, and therefore, warrants a remand. [Doc. 16 at 7]. Specifically, Plaintiff replies that Dr. Huthwaite's diagnosis is consistent with Plaintiff's treating internist and Plaintiff's testimony. [*Id.*]. Plaintiff also responds that Dr. Dawson treated Plaintiff during the relevant time period and his 2008 limitations are similar to those found by Dr. Entrekin in 2005. [*Id.*]. Finally, Plaintiff responds that Plaintiff's treating cardiologist's opinion is entitled to significant weight even though he did not treat Plaintiff until after the relevant date. [*Id.* at 8].

Generally, a claimant is allowed to present new evidence at each stage of the administrative process. *See* 20 C.F.R. § 404.900(b); *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260-61 (11th Cir. 2007). A remand under sentence six is "appropriate when the district court learns of evidence not in existence or available to the claimant at the time of the administrative proceeding that might have changed the outcome of that proceeding." *Couch v. Astrue*, 267 Fed. Appx. 853, 857 (11th Cir. 2008) (citing *Ingram*, 496 F.3d at 1267). To obtain a sentence six remand, a claimant must establish that: (1) there is new, non-cumulative evidence; (2) the evidence is material in that it is relevant and probative so that there is a reasonable probability that it would change the administrative results; and (3) there is good cause for failure to

44

submit the evidence at the administrative level. *See Vega v. Comm'r of Soc. Sec.*, 265 F.3d 1214, 1218-19 (11th Cir. 2001); *Cannon v. Bowen*, 858 F.2d 1541, 1546 (11th Cir. 1988). Evidence is material if there is a reasonable probability that it would change the administrative outcome. *Hyde v. Bowen*, 823 F.2d 456, 459 (11th Cir. 1987). However, the new evidence must relate back to the time period on or before the date of the ALJ's decision. *See* 20 C.F.R. § 404.970(b); *Barclay v. Comm'r of Soc. Sec. Admin.*, 274 Fed. Appx. 738, 743-44 (11th Cir. 2008).

Initially, the Court notes that Plaintiff's new evidence was presented for the first time to this Court. Therefore, sentence six is the appropriate standard for determining whether the evidence warrants a remand. The Commissioner appears to concede that Plaintiff can show good cause for failing to present the just-submitted evidence from Huthwaite, Paulsen and Dawson, in that these reports did not exist at the time of the hearing before the ALJ, because the Commissioner only argues that the evidence is not material.[36] *See Cherry v. Heckler*, 760 F.2d 1186, 1192 (11th Cir. 1985) ("Good cause for failing to present evidence earlier may exist where, as here, the evidence did not

---

[36]     The materiality requirement is not rebutted by the Commissioner's statement that the new evidence would not ultimately change the decision because such a statement is not in the certified record, and therefore carries little weight and is advisory at best. *Caulfer v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986); *Cherry*, 760 F.2d at 1194.

AO 72A
(Rev.8/8
2)

exist at the time of the administrative proceeding. The Secretary appears to concede this point, instead arguing only that the new evidence is not sufficiently material.") (internal citations omitted). Thus, the Court will only address whether the evidence from Drs. Huthwaite, Paulsen, and Dawson is material.

There is very little, if anything, that is contained in Dr. Huthwaite's report that relates back to the time period on or before the date of the ALJ's decision, June 6, 2006. Dr. Huthwaite evaluated Plaintiff on October 5, 2007, and administered a current mental status examination. [Doc. 13-2]. His report states that Plaintiff suffers from a major depressive disorder which is recurrent and moderate, [*id*. at 5], but the Court can only infer or interpolate that this conclusion relates to the time period which the regulations require the Court to consider. Therefore, Dr. Huthwaite's October 5, 2007, report does not satisfy the requirements for a sentence six remand. *Cf. Lipscomb v. Comm'r of Soc. Sec.*, 199 Fed. Appx. 903, 907 (11th Cir. 2006) (finding remand appropriate where doctor "indicated that his questionnaire answers related to his perception of [plaintiff's] condition as it existed prior to the ALJ's decision.").

Dr. Paulsen's report suffers from the same shortcomings. The report was dated March 14, 2008, but does not give any indication that Dr. Paulsen considered her conclusions to be applicable to the pre-June 2006 time frame. Although the Court is

46

cognizant of the fact that the administrative record contains evidence of many of the same impairments or restrictions which are described in Dr. Paulsen's 2008 report, "there is no way of knowing whether the new evidence related to the complaints relative to the time period before the ALJ. *Archer v. Comm'r of Soc. Sec.*, 176 Fed. Appx. 80, 82 (11th Cir. 2006).

The issue as to Dr. Dawson's March 19, 2008, report is a bit closer, but as with the other recently-submitted materials, the new evidence from Dr. Dawson does not relate to the relevant time period. The administrative record contains evidence of Dr. Dawson treating Plaintiff on January 26, 2005, [R438], April 15, 2005, [R372], May 11, 2005, [R369], September 12, 2005, [R368], and October 4, 2005, [R365]. The Functional Classification report also shows that the last examination before the report was prepared was December 20, 2007. Thus, there is over a two-year gap in the treatment records, and the March 2008 contains no indication that Dr. Dawson's conclusions applied to the pre-June 2006 time period. Moreover, to the extent that Dr. Dawson's conclusion appears to bolster those made by Dr. Entrekin in 2005, the report then is cumulative. In any event, the Court is prohibited from considering " 'implicit' conclusions that the medical condition existed for an extended period of time that would cover the period of disability before the ALJ." *Archer*,

47

176 Fed. Appx. at 83 (citing *Wilson v. Apfel*, 179 F.3d 1276, 1279 nn. 4-5 (11th Cir. 1999)).  As a result, Plaintiff has failed to satisfy her burden in this point.  *Allen v. Barnhart*, 174 Fed. Appx. 497, 499 (11th Cir. 2006) (citing *Cherry*, 760 F.2d at 1192).

Accordingly, the Commissioner's decision is **AFFIRMED** on Plaintiff's contention that reports from Drs. Huthwaite, Paulsen, and Dawson were improperly not considered in determining whether Plaintiff was disabled for purposes of the Act.

B.    *The ALJ's Assessment of Plaintiff's Treating Physician*

Plaintiff argues that the ALJ erred in discounting Dr. Entrekin's opinion because he is not specialist, but failed to note that Dr. Entrekin referred Plaintiff to specialists and possessed their reports.  [Doc. 12 at 20].  Plaintiff also argues that other evidence in the record supports Dr. Entrekin's opinion.  [*Id*.].  Specifically, Plaintiff argues that the exercise stress test performed by Dr. Zavala supports Dr. Entrekin's opinion.  Plaintiff further argues that the ALJ erred by improperly rejecting Dr. Entrekin's opinion in favor of the non-examining consultant who did not discuss the stress test and did not have the benefit of Dr. Entrekin's report.  Finally, Plaintiff argues that the ALJ was required to recontact Dr. Entrekin since he found his opinion unsupported and contradictory.  [*Id*. at 21].

48

Defendant responds that substantial evidence supports the ALJ's decision to reject the opinion of Dr. Entrekin because his opinion is contrary to his own office notes and the record as a whole. [Doc. 15 at 15]. Specifically, the Commissioner responds that Dr. Entrekin examined Plaintiff five times between October 2004 and October 2005 and noted that Plaintiff had a number of diagnoses, but such diagnoses do not establish that Plaintiff had a functional limitation. [*Id*.]. Next, Defendant argues that Dr. Entrekin's minimal objective findings do not support the disabling limitations he included in his opinion. [*Id*. at 16]. Defendant also argues that Dr. Entrekin's conservative treatment of Plaintiff undermines his opinion. [*Id*. at 16-17]. Further, Defendant argues that Dr. Entrekin's opinion is inconsistent with other medical evidence in the record. [*Id*. 17-19]. Finally, Defendant argues that Dr. Hassinger's opinion supports the ALJ's decision to discount the opinion of Dr. Entrekin because although the Dr. Hassinger did not have access to all of Plaintiff's medical records, the ALJ did, and found that Dr. Hassinger's opinion was supported by the record. [*Id*. at 20].

Plaintiff replies that the ALJ failed to identify any inconsistency in Dr. Entrekin's opinion and ignored that fact that specialists had provided Dr. Entrekin with their reports. [Doc. 16 at 1]. Plaintiff also responds that Defendant's reasons amount to an

49

improper post hoc rationalization for the ALJ's decision. [*Id*. at 2]. Plaintiff next replies that Dr. Entrekin's failure to recommend any "noteworthy" treatment does not undermine his opinion because there is no correlation between a specific therapy and the severity of limitations imposed by the impairment. [*Id*. at 2]. Additionally, Plaintiff replies that the ALJ erred in relying on the opinion of a non-examining consultant because he did not have access to all of the medical evidence. [*Id*. at 3]. Finally, Plaintiff replies that the ALJ erred by failing to recontact Dr. Entrekin since he claimed that his report is unsupported and contradictory. [*Id*. at 4].

This issue actually involves two separate inquiries: whether the ALJ properly (1) relied upon the non-examining consultative evaluation, and (2) rejected, or gave little weight to, the opinion of the examining physician, Dr. Entrekin.

### 1.    *Reliance upon Dr. Hassinger's Report*

Generally, the opinions of examining or treating physicians are given more weight than non-examining or non-treating physicians, and specialists on issues within their areas of expertise are afforded more weight than non-specialists. *See* 20 C.F.R. § 404.1527(d)(1), (2) & (5); *see also Davis v. Barnhart*, 186 Fed. Appx. 965, 967 (11th Cir. 2006)*; Sharfarz v. Bowen*, 825 F.2d 278, 280 (11th Cir. 1987). Thus, the ALJ should generally give greater weight to the examining physician's report than a

50

non-examining physician's.  *See Broughton v. Heckler*, 776 F.2d 960, 962 (11th Cir.

1985).  The opinion of a non-examining physician, standing alone, does not constitute

substantial evidence.  *Kemp v. Astrue*, No. 08-12805, 2009 WL 163019, *3

(11th Cir. Jan. 26, 2009) (citing *Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988)).

Moreover, a non-examining doctor's report is entitled to little weight when it

contradicts that of an examining doctor's report.  *Edwards v. Sullivan*, 937 F.2d 580,

584 (11th Cir. 1991); *see also Spencer ex rel. Spencer v. Heckler*, 765 F.2d 1090, 1094

(11th Cir. 1985) (according "little weight" to a reviewing physician's opinion if it

contradicts the opinion of the only physician to examine the patient).  The weight to be

given a non-examining physician's opinion depends, among other things, on the extent

to which it is supported by clinical findings and is consistent with other evidence.

*See* 20 C.F.R. § 404.1527(d)(3)-(4); *see also Crawford v. Comm'r of Soc. Sec.*,

363 F.3d 1155, 1158, 1160 (11th Cir. 2004) (holding that the ALJ did not err in relying

on consulting physician's opinion where it was consistent with medical evidence and

findings of the examining physician).  Generally, the more consistent a physician's

opinion is with the record as a whole, the more weight an ALJ will place on that

opinion. *Kemp*, 2009 WL 163019 at *4 (citing 20 C.F.R. § 404.1527(d)(4)).  The ALJ

51

is free to reject the opinion of any physician when the evidence supports a contrary conclusion. *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985).

The Court finds that the ALJ's conclusion in reliance on Dr. Hassinger's opinion is not supported by substantial evidence. The Court first notes that the ALJ's reliance on Dr. Hassinger's opinion is not improper merely because Dr. Hassinger's report was not based on all the evidence of record. *See Corbitt v. Astrue*, No. 3:07-cv-518-J-HTS, 2008 WL 1776574, *5 (M.D. Fla. Apr. 17, 2008).[37] That is, the ALJ could have properly relied on Dr. Hassinger's report if it was consistent with the later medical information.

However, in this case, the ALJ accepted Dr. Hassinger's report on the basis that it "contains a thorough review of the medical records and appears to be the best

_____

[37]    In *Corbitt*, the court observed:

Regarding the level of information available to the nonexamining physicians, the Court notes it is commonplace for reviewing opinions to be based on less than the entire record as ultimately developed. Often, said opinions are rendered well prior to the close of proceedings before an ALJ and the receipt of additional evidence. Although the scope of the record reviewed by any source is a circumstance worth keeping in mind, the opinion is not automatically valueless where that record was less than complete. Here, it was permissible for the judge to utilize the opinions at issue as a partial justification for his determination.

*Corbitt*, 2008 WL 1776574 at *5.

AO 72A
(Rev.8/8
2)

estimate of the claimant's residual functional capacity." [R4T]. It is clear that Dr. Hassinger's report was, at most, based on a review of only some of the medical evidence, but more significantly, it predated and is inconsistent with records which were not reviewed by the non-examining consultant. For example, Dr. Hassinger did not have the benefit of Dr. Zavala's findings that Plaintiff had a moderate to severe functional impairment as to her oxygen consumption and poor prognosis due to her metabolic equivalents. [R332]. This would appear to be inconsistent with Dr. Hassinger's opinions of Plaintiff's exertional capabilities. [*See* R358 (indicating that Plaintiff could frequently carry or lift 10 pounds and stand or walk at least two hours with normal breaks in an eight-hour day)].

Nor did Dr. Hassinger's evaluation take into consideration Plaintiff's intermittent continued complaints of shortness of breath, as recorded by Drs. Dawson, Jacobson and Entrekin, nor Dr. Jacobson's findings of hypoglycemic incidents and poor glycemic control. These treating physicians' reports are inconsistent with Dr. Hassinger's opinions. While the ALJ gave Dr. Entrekin's opinion little weight, [R4T], Dr. Hassinger's report, authored in August 2003, did not have the advantage of any of Dr. Entrekin's longitudinal records, which only began in 2004. Therefore, the ALJ's

AO 72A
(Rev.8/8
2)

opinion, based upon Dr. Hassinger's assessment, is not supported by substantial evidence.

### 2. Rejection of Dr. Entrekin's Report

Next, the Court concludes that the ALJ erred in discounting the opinion of Dr. Entrekin. A treating physician's opinion "must be given substantial or considerable weight unless 'good cause' is shown to the contrary." *Crawford*, 363 F.3d at 1159 (quoting *Lewis*, 125 F.3d at 1440); *see also* 20 C.F.R. § 404.1527(d)(2). "Good cause" exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records. *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004). The ALJ must clearly articulate the reasons for giving less weight to the treating physician's opinion, *Lewis*, 125 F.3d at 1440, by "always giv[ing] good reasons in the notice of the . . . decision for the weight given to a treating source's medical opinion(s)." Social Security Ruling (SSR) 96-2p.[38] The

---

[38]     The Social Security Rulings are published under the authority of the Commissioner of Social Security and are binding on all components of the administrative process. *See Sullivan v. Zebley*, 493 U.S. 521, 530 n.9 (1990); *see also Tauber v. Barnhart*, 438 F. Supp. 2d 1366, 1377 n.6 (N.D. Ga. 2006) (citing 20 C.F.R. § 402.35(b)(1)). Although SSRs do not have the force of law, they are entitled to deference so long as they are consistent with the Social Security Act and regulations. *Massachi v. Astrue*, 486 F.3d 1149, 1152 n.6 (9th Cir. 2007); *see also Salamalekis v.*

ALJ's proffered reasons for discounting the treating doctor's opinion must be supported by substantial evidence. *Mills v. Astrue*, 226 Fed. Appx. 926, 931 (11th Cir. 2006) (citing *Lamb*, 847 F.2d at 703). Thus, when the decision is not fully favorable to a claimant, the ALJ's decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* If the ALJ ignores or fails to properly refute the treating physician's opinion, the treating physician's opinion is deemed to be true as a matter of law. *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986).

Initially, the Court notes that the ALJ did not err by failing to recontact Dr. Entrekin. The applicable regulation, 20 C.F.R. § 404.1512(e), provides that a treating physician will be recontacted when the evidence received from the treating physician "is inadequate for [the ALJ] to determine whether [the claimant is] disabled,"

---

*Commissioner of Social Sec.*, 221 F.3d 828, 832 (6th Cir. 2000) ("If a Social Security Ruling presents a reasonable construction of an ambiguous provision of the Act or the agency's regulations, we usually defer to the SSR."); *State of Minn. v. Apfel*, 151 F.3d 742, 748 (8th Cir. 1998) ("Social Security Rulings, although entitled to deference, are not binding or conclusive."); *Pass v. Chater*, 65 F.3d 1200, 1204 n.3 (4th Cir. 1995); *Gordon v. Shalala*, 55 F.3d 101, 105 (2d Cir. 1995); *Andrade v. Sec'y of Health and Human Servs.*, 985 F.2d 1045, 1051 (10th Cir. 1993).

AO 72A
(Rev.8/8
2)

and directs the ALJ to seek "additional evidence or clarification from [the claimant's] medical source when the report from [the claimant's] medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." *Id*. § 404.1512(e)(1). Therefore, the ALJ has a duty to recontact the treating physician only when evidence from the treating physician is inadequate, not when the ALJ rejects the treating physician's opinion. *See White v. Barnhart*, 287 F.3d 903, 908 (10th Cir. 2001). Here, the ALJ did not find the information from Dr. Entrekin inadequate. Rather, he concluded that Dr. Entrekin's conclusions were not supported. [*See* R4T-4U]. Thus, Plaintiff's argument that the ALJ should have recontacted Dr. Entrekin because the ALJ rejected his opinion is without merit, as the regulations do not require the ALJ to recontact a treating physician if the ALJ rejects the treating physician's opinion. The Court now turns to Plaintiff's main contention, that the ALJ improperly rejected Dr. Entrekin's November 30, 2005, assessment.

Dr. Entrekin's November 30, 2005, Functional Capacity Evaluation provided that he was Plaintiff's treating primary care physician and had seen her every three months for eighteen months. [R485]. Dr. Entrekin further reported that Plaintiff suffered from

56

diabetes, congestive heart failure, diabetic retinopathy, arthritis in her lower spine, renal insufficiency, hypertension, coronary artery disease, and depression. [*Id*.]. In support of his diagnoses, Dr. Entrekin noted that an echocardiogram of Plaintiff' heart revealed congestive heart failure, an eye exam revealed diabetic retinopathy, x-rays of the lower spine revealed degenerative disc disease, and lab tests showed diabetes and high cholesterol. [*Id*.]. He also noted that Plaintiff gets out of breath and energy with minimal effort and incurs back pain which keeps her from being able to sit or stand in one position very long. [*Id*.]. In addition, Plaintiff was noted to be obese and suffer from depression, which, with her other impairments, reasonably caused her physical and mental symptoms. [R487]. Finally, Dr. Entrekin concluded that Plaintiff could not work an eight-hour work day because she suffered from "multiple medical problems requiring multiple prescription medications. The combination of these leads to a much reduced energy level which affects her ability to work at a regular job." [R491].

The Court concludes that the ALJ's rejection of Dr. Entrekin's opinion is partially based on substantial evidence, and partially not based on substantial evidence. The Court finds that the ALJ's rejection of Dr. Entrekin's assessment of Plaintiff's depression as disabling was proper as inconsistent with Dr. Entrekin's own notes, the record as a whole, and lack of treatment other than medications. Although Plaintiff

57

complained of depression, and was on medications to ameliorate its symptoms, there is no evidence in the record before the ALJ supportive of Dr. Entrekin's conclusion that Plaintiff's depression was a disabling impairment or, as he concluded, that the depression contributed to her disabling pain. [*See* R487].

Similarly, the Court finds that although Plaintiff did suffer from back pain and some manipulative limitations, the ALJ properly discounted Dr. Entrekin's opinion because the extent of her impairment due to those conditions as reported by Dr. Entrekin was not supported by the record as a whole. The ALJ's discussion of the orthopedic records on file provides substantial evidence for rejecting Dr. Entrekin's opinion as to these impairments.

On the other hand, the ALJ discounted Dr. Entrekin's opinions that Plaintiff had low energy, could not sit or stand for long periods, and must elevate her legs on the grounds that Dr. Entrekin was not a specialist. [R4T]. The Court recognizes that an ALJ may properly rely on opinion of an examining physician, who was a specialist in one of the areas of claimed impairment, over that of a treating physician, who was not. *See Andrews v. Shalala*, 53 F.3d 1035, 1042 (9th Cir. 1995); *Gavigan v. Barnhart*, 261 F. Supp. 2d 334, 341 n.10 (D. Md. 2003) (approving reliance on rheumatologist to evaluate fibromyalgia than an orthopedist); *see also* 20 C.F.R. § 416.927(d)(2)(ii)(5)

58

("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.").

However, the record reflects that besides personally treating Plaintiff, Dr. Entrekin either was the referring physician to specialists or was kept abreast of her treatment by these specialists. The Court's review of the record shows that although Dr. Entrekin was Plaintiff's primary care physician, he referred Plaintiff to or consulted with various specialists, including: (1) cardiologist Dr. Dawson, who in January and October 2005 found that Plaintiff continued to gain weight, experienced shortness of breath, and that her heart remained enlarged, [R365-67, 439]; (2) cardiologist Dr. Flores, who in October 2004 noted that Plaintiff suffered from among other things, severe coronary artery disease, mild renal failure, morbid obesity, and was on an insulin pump for her diabetes, [R407]; (3) nephrologists Dr. Abdalla and Dr. Joshi, who in January and April 2005 noted that Plaintiff suffered from moderate renal insufficiency and stage III kidney disease, and morbid obesity, and complained of shortness of breath, [R441, 463]; and (4) orthopedist Dr. Greenfield who in May 2004 noted that Plaintiff had decreased disc height at the L4-L5 and L5-S1 vertebrae and that her symptoms could be reduced with a weight loss program. [R477-78]. However,

AO 72A
(Rev.8/8
2)

Dr. Joshi's records also explained that Plaintiff's insulin pump caused her weight gain to slowly worsen. [R475]. Dr. Entrekin had access to these records as he either referred Plaintiff to these specialists or was copied on their treatment notes. Moreover, Dr. Entrekin's own treatments notes indicate that Plaintiff suffered from a number of medical conditions that he monitored and for which he prescribed a variety of medications. [R419-62].

As has been noted in another context, "the physician making a diagnosis must necessarily rely on many observations and tests performed by others and recorded by them." *Birdsell v. United States*, 346 F2d 775, 779-80 (5th Cir. 1965). In this regard, the Commissioner's own regulations recognize that treating physician's opinions as to areas where he is not a specialist will be based on reports and tests of others, and are entitled to weight:

> Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. *We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.* For example, if your ophthalmologist notices that you have complained of neck pain during your eye examinations, we will consider his or her opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the neck pain. When the treating source has reasonable knowledge of your impairment(s), we will

give the source's opinion more weight than we would give it if it were
from a nontreating source.

20 C.F.R. § 416.927(d)(2)(ii) (emphasis supplied). Thus, the Commissioner's own

regulations anticipate that a treating physician will consider and rely upon the opinions

of other doctors in rendering an opinion about a patient's diagnosis and prognosis.

The Court recognizes that the ALJ did not simply disregard or discount

Dr. Entrekin's opinion because he was not a specialist. As discussed above, the ALJ

discounted Dr. Entrekin's conclusions because he found that certain of the opinions

expressed by Dr. Entrekin were "contrary to his own office notes as well as to the

record as a whole." [R4TU]. Moreover, an ALJ is not required to specifically discuss

every piece of evidence in the record. *Newsome ex rel. Bell v. Barnhart*,

444 F. Supp. 2d 1195, 1198 n.2 (M.D. ala. 2006) (citing *Ogranaja v. Comm'r of Soc.*

*Sec.*, 186 Fed. Appx. 848, 851 (11th Cir. 2006) ("We do not require the ALJ to

'specifically refer to every piece of evidence in his decision,' so long as the decision

is sufficient to allow us to conclude that the ALJ considered the claimants' medical

condition as a whole."). However, in this case, the ALJ did not clearly discuss why he

rejected Dr. Entrekin's conclusions as to her heart disease and diabetes, and their

associated impairments, which were documented by the specialists and transmitted and

61

relied upon by Dr. Entrekin. As a result, the Court finds that the ALJ's rejection of Dr. Entrekin's opinions because he was not a specialist does not amount to good cause.

Ordinarily, when an ALJ improperly or inadequately rejects a treating physician's opinion, the physician's opinion is accepted as true as a matter of law. *MacGregor*, 786 F.2d at 1050. However, some of the ALJ's reasons were proper and have substantial support in the record. Moreover, the ALJ did not ignore Dr. Entrekin's opinion, but rather gave it little weight. *Compare id.*, 786 F.2d at 1053 (noting that treating physician's opinion was not discredited nor weight assigned to it). Instead, as in *Harris v. Astrue*, 546 F. Supp. 2d 1267, 1282 (N.D. Fla. 2008), the ALJ in this case substantially complied with the Commissioner's regulations, but some of his reasons for discrediting the opinions of Dr. Entrekin were improper. "Therefore, remand is the appropriate remedy, and upon remand, the opinions of Dr. [Entrekin] should be reconsidered. If the opinions are again discredited, the reasons for doing so should be proper and supported by substantial evidence in the record." *Id.*

Accordingly, the Commissioner's decision is **REVERSED** and the case **REMANDED** to the Commissioner for further consideration of Dr. Entrekin's evaluation of Plaintiff's residual functional capacity assessment.

AO 72A
(Rev.8/8
2)

C.     *The ALJ's Assessment of Plaintiff's Mental Impairment*

Plaintiff argues that the ALJ erred in rejected Dr. Entrekin's opinion that her depression did not cause any functional limitations. [Doc. 12 at 21]. Specifically, Plaintiff argues that the ALJ should have ordered a consultative evaluation regarding Plaintiff's mental impairments because she presented a colorable claim of a mental impairment. [*Id*. at 22]. Plaintiff also argues that the ALJ erred by not completing a Psychiatric Review Technique Form ("PRTF") regarding Plaintiff's depression. [*Id*.].

Defendant responds that the ALJ properly evaluated Plaintiff's mental condition because Plaintiff failed to show that her mental condition interfered with her ability to work for a consecutive twelve month period. [Doc. 15 at 22]. Specifically, Defendant responds that Dr. Entrekin's occasional notes that Plaintiff suffered from depression do not indicate that Plaintiff's mental condition interfered with her ability to work. [*Id*.]. Defendant also responds that other physicians who treated Plaintiff did not indicate that she suffered from depression. [*Id*. at 22-24]. Defendant further responds that Plaintiff's depression did not cause any functional limitations because Dr. Entrekin never referred Plaintiff for mental health treatment, nor did Plaintiff request to be referred for mental health treatment. [*Id*. at 24]. Additionally, Defendant responds that the ALJ was not required to order a consultative examination because the record

AO 72A
(Rev.8/8
2)

contained sufficient evidence for the ALJ to make an informed decision and Plaintiff failed to show that a consultative examination was necessary. [*Id*. at 25-26]. Finally, Defendant responds that the ALJ was not required to complete a PRTF because Plaintiff did not present a colorable claim of a mental impairment based on depression. [*Id*. at 26-27].

Plaintiff replies that because Dr. Entrekin had diagnosed her with depression, the ALJ erred by not completing a PRTF. [Doc. 16 at 4-5]. Plaintiff also replies that she presented a colorable claim of a mental impairment based on depression. [*Id*. at 5]. Plaintiff further replies that it is immaterial that Plaintiff did not allege that she suffered from depression because an ALJ was required to investigate Plaintiff's claim because it was offered at the hearing as a basis for disability. [*Id*. 6]. Finally, Plaintiff replies that the ALJ could not have made an informed decision regarding Plaintiff's depression in the absence of a consulting medical evaluation. [*Id*.].

First, Defendant's argument that Plaintiff did not present a claim for a mental impairment based on depression because she did not allege that she had a mental impairment in her disability documents is without merit. As pointed out by Plaintiff's counsel, *Street v. Barnhart*, 133 Fed. Appx. 621 (11th Cir. 2005), the case relied upon by Defendant, does not stand for the proposition that a plaintiff fails to raise a claim of

AO 72A
(Rev.8/8
2)

a mental impairment if it is not listed in the disability application.  In *Street*, the Court determined that Street had failed to raise a mental impairment claim because he "did not list any mental impairment or intellectual functioning issues in his application for SSI benefits, *nor did he testify at his hearing* that he suffered from any intellectual or mental impairments that would prevent him from working."  *Id*. at 627 (emphasis supplied).  The *Street* Court further noted that: "Street could easily have corrected at the hearing by putting the ALJ on notice of the deficiency, if indeed one existed based on the record evidence.  He failed to do that. . . ."  *Id*.  Thus, the Eleventh Circuit in *Street* recognized that "that an 'administrative law judge is under no obligation to investigate a claim not presented at the time of the application for benefits *and not offered at the hearing as a basis for disability*.' " *Id.* (emphasis supplied) (quoting *Pena v. Chater*, 76 F.3d 906, 909 (8th Cir. 1996)).

Here, Plaintiff testified about her depression and the limitations caused by it at the hearing before the ALJ.  Specifically, Plaintiff testified:

A:     Because I have no energy, I mean, I can't do things that I used to because I get tired very easily and just exhausted.  I get out of breath with any little thing I try to do.  I get depressed because of it.

Q:     Do you take any treatment for depression?

65

A:     Yes, I'm taking Effexor for depression.

Q:     When you say you're depressed what does that mean?

A:     I get real upset about things that I used to could do and can't do and I start crying and just get very emotional.

Q:     How often do you have those crying spells?

A.     At least once a week if not two, sometimes two, sometimes, you know- -

Q:     How long do they last?

A:     They'll last about an hour or a little longer.

[R507]. Thus, it is apparent that Plaintiff raised a mental impairment claim based on depression, and therefore, the ALJ was obligated adequately address whether Plaintiff has any functional limitations from her depression.

Next, the Court concludes that Plaintiff has raised a colorable claim of a mental impairment based on depression. Where a claimant has presented a colorable claim of mental impairment, the Commissioner's regulations require the ALJ to complete a PRTF and append it to the decision, or incorporate its mode of analysis into his findings and conclusions. *Moore v. Barnhart*, 405 F.3d 1208, 1214 (11th Cir. 2005), *see also Gutierrez v. Apfel*, 199 F.3d 1048, 1051 (9th Cir. 2000). Failure to do so requires remand. *Moore*, *id.* The Commissioner's regulations specifically provide that the

AO 72A
(Rev.8/8
2)

PRTF or functional analysis contained therein must be completed before an ALJ makes the determination about whether a mental impairment is severe or not severe. 20 C.F.R. § 404.1520a; *Pettaway v. Astrue*, No. CA 08-0171-C, 2008 WL 5111175, *4 n.5 (S.D. Ala. Dec. 3, 2008) ("The Commissioner's regulations specifically provide that the PRTF or functional analysis contained therein must be completed before an ALJ makes the determination about whether a mental impairment is severe or not severe."). One of the stated purposes for the "special technique" is to help the Social Security Administration "organize and present [its] findings in a clear, concise, and consistent manner." *Grant v. Astrue*, No. 3:07-cv-572-J-TEM, 2008 WL 4360985, *7 (M.D. Fla. Sept. 24, 2008) (citing 20 C.F.R. § 404.1520a(3)). The specific documentation requirements "are not mere technicalities that can be ignored as long as the ALJ reaches the same result that it would have if it had followed those requirements." *Id.* (citing *Selassie v. Barnhart*, 203 Fed. Appx. 174, 176 (9ᵗʰ Cir. 2006)).

In addition to his assessment of Plaintiff's RFC, Dr. Entrekin noted in October 2004 that Plaintiff was suffering from depression and placed her on the anti-depressant Effexor. [R460, 462]. Although Dr. Entrekin noted that Plaintiff's depression was stable on April 14, 2005, he continued her on her Effexor regimen. [R433, 426].

AO 72A
(Rev.8/8
2)

Moreover, many of Plaintiff's treating specialists noted that she was taking Effexor. [R365, 369, 374-76, 405, 422, 430, 439]. Also, Plaintiff's orthopedist, Dr. Greenfield, noted in May 2004 that she suffered from depression. [R477]. Additionally, on January 26, 2005, Dr. Dawson reported in his treatment notes that Plaintiff suffered from depression and was taking medication. [R438-39]. The undersigned notes that all of these records were included in record before the ALJ. However, the ALJ did not discuss this evidence when he determined that Plaintiff's mental impairment was not severe.

Here, the ALJ did not complete the "special technique" form. Moreover, the ALJ never rated Plaintiff's degree of functioning in the four functional areas of daily living, social functioning, concentration, persistence or pace, and episodes of decompensation. Instead, the extent of the ALJ's analysis was as follows:

> Claimant has been treated for depression with medication. She has not complained of any adverse side effects, nor has she complained that her depression was resistant to treatment, as she has done with back pain or weight gain. The claimant has not sought counseling or other therapeutic measures to address depression. Any depression experienced by the claimant appears to have been adequately addressed by medication. When taking her medication, the claimant has no limitations from her depression that would cause even a minimal degree of difficulty with performing work-related activities. Depression therefore, is not a severe impairment.

68

[R4T]. Since the ALJ's analysis failed to comply with the Commissioner's own regulations and the Eleventh Circuit's *Moore* decision, the Court concludes that remand is warranted.

Accordingly, the Commissioner's decision is **REVERSED** and the case **REMANDED** to the Commissioner for consideration of Plaintiff's depression pursuant to the Commissioner's regulations and the *Moore* decision.

D.    *Assessment of Plaintiff's Credibility*

Plaintiff argues that the ALJ erred in failing to articulate his reasons for discrediting Plaintiff's subjective complaints of limitations related to her headaches and crying spells. [Doc. 12 at 22-23].

Defendant responds that the ALJ properly evaluated Plaintiff's subjective complaints. [Doc. 15 at 27]. Specifically, Defendant responds that the ALJ generally found Plaintiff's symptoms to be credible, but implicitly found her allegations regarding headaches and crying spells to not be credible. [*Id*. at 27-28]. Next, Defendant responds that no medical evidence supports, nor has the Plaintiff pointed to any evidence to support, her allegations regarding her headaches and crying spells. [*Id*. at 28].

69

Plaintiff replies that the ALJ erred in assessing Plaintiff's credibility because he did not explicitly state the reasons for discrediting Plaintiff's complaints regarding her headaches and crying spells. [Doc. 16 at 9].

"[C]redibility determinations are the province of the ALJ." *Moore*, 405 F.3d at 1212. The assessment of a claimant's credibility about her pain and other symptoms and their effect on her ability to function must be based on a consideration of all of the evidence in the case record. 20 C.F.R. §§ 404.1529(c), 416.929(c); SSR 96-7p. If the ALJ decides to discredit a claimant's subjective testimony, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *Foote*, 67 F.3d at 1561-62) (citing *Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988)); *see also* 20 C.F.R. § 416.929; SSR 96-7p; *Kieser v. Barnhart*, 222 F. Supp. 2d 1298, 1310 (M.D. Fla. 2002). A broad statement rejecting a claimant's credibility is insufficient. *See Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). A reviewing court will not disturb a clearly articulated credibility finding if there is substantial supporting evidence in the record. *Kieser*, 222 F. Supp. 2d at 1310. However, the ALJ's failure to state a reasonable basis for rejecting the subjective testimony requires that the testimony be accepted as true. *See Foote*, 67 F.3d at 1562.

70

AO 72A
(Rev.8/8
2)

The Court concludes that substantial evidence supports the ALJ's assessment of Plaintiff's credibility. First, as pointed out by Defendant, there is no medical evidence to support Plaintiff's subjective testimony that she suffered from disabling headaches and crying spells. Nor has Plaintiff pointed to any medical records showing that she ever complained of headaches or crying spells. The Court recognizes that Dr. Entrekin treated Plaintiff for depression. However, neither Dr. Entrekin's treatment notes nor his RFC assessment indicates that Plaintiff suffers from headaches or crying spells.

Next, the ALJ adequately discussed Plaintiff's credibility regarding her subjective complaints. Specifically, the ALJ stated that Plaintiff's "medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that claimant's statements concerning the intensity, duration and limiting effects of those symptoms are generally credible." [R4T]. The ALJ then noted that Plaintiff's complaints of dypsnea, leg, back and foot pain, fatigability, and musculoskeletal complaints were generally credible. [*Id.*]. Thus, it appears that the ALJ implicitly found Plaintiff's other allegations to be not credible. *See Carlson v. Chater*, 74 F.3d 869, 871 (8th Cir. 1996) (finding that and ALJ's implicit credibility finding as to testimony of husband of applicant for disability benefits, made after

71

discussing specifics of that testimony, was sufficient to support his analysis of that testimony).

Accordingly, the Court concludes that the ALJ sufficiently explained his credibility assessment and Plaintiff's arguments for reversal on this ground are rejected.

## VII. CONCLUSION

For the reasons set forth above, the decision of the Commissioner is **AFFIRMED IN PART** and **REVERSED IN PART**. This matter is **REMANDED** to the Commissioner for further consideration of Plaintiff's claims consistent with this Order. On remand, at a minimum, (1) the Commissioner shall re-evaluate the opinions of Dr. Entrekin; (2) evaluate Plaintiff's depression in compliance with the regulations and *Moore v. Barnhart*, *supra*; and (3) if the Commissioner elects to consider the opinion of a non-treating, non-examining consultative physician, seek an updated evaluation.

Pursuant to the Eleventh Circuit's suggestion in *Bergen v. Commissioner of Social Security*, 454 F.3d 1273, 1278 n.2 (11th Cir. 2006), Plaintiff **SHALL** have until **ninety (90) days** after he receives notice of any amount of past due benefits awarded to seek attorney's fees under the Social Security Act, 42 U.S.C. § 406(b); *see also Blitch v. Astrue*, No. 07-11298, 2008 WL 73668, *1 n.1 (11th Cir. Jan. 8, 2008).

72

AO 72A
(Rev.8/8
2)

The Clerk is **DIRECTED** to enter judgment for Plaintiff.

**IT IS SO ORDERED and DIRECTED**, this the 9th day of March, 2009.

_____
**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

AO 72A
(Rev.8/8
2)